## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**DARRIUS L. WORTHEY,**

      **Petitioner,**

**v.**                              **Case No. 4:18cv509-WS/CAS**

**STATE OF FLORIDA,**

      **Respondent.**

_____/

## REPORT AND RECOMMENDATION

On or about November 2, 2018, Darrius L. Worthey filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 1. He subsequently filed an amended § 2254 petition. ECF No. 9; *see* ECF No. 19. On May 9, 2019, Respondent filed an answer, with exhibits. ECF No. 13. Petitioner has filed a reply. ECF No. 20.

The matter was referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(B). After careful consideration, the undersigned has determined no evidentiary hearing is required for the disposition of this matter. *See* Rule 8(a), R. Gov. § 2254 Cases. The pleadings before the Court show the petition should be denied.

## **Procedural Background**

Following a trial in case number 2011-CF-1464A, in the Second Judicial Circuit, Leon County, a jury convicted Petitioner Darrius L. Worthey of three counts, in connection with events that occurred May 7, 2011, at the Walker-Ford Community Center: (1) first degree murder (victim Maricus Deshazier), a capital felony in violation of section 782.04(1), Florida Statutes; (2) attempted second degree murder (victim Christopher Deshazier), a first degree felony in violation of section 782.04(3), Florida Statutes; and (3) attempted armed robbery with a firearm, a second degree felony in violation of section 812.132, Florida Statutes. Ex. C.[1] Worthey testified at the trial. Ex. B at 348-69. David Collins, assisted by his son Charles Collins, represented Worthey. *See* Ex. B. On December 20, 2012, the trial court adjudicated Worthey guilty and sentenced him to life in prison on Count 1, thirty (30) years in prison on Count 2 with a minimum mandatory term of twenty (20) years, and twenty-five (25) years in prison on Count 3, to run concurrently. Ex. C.

---

[1] Hereinafter, all citations to the state court record, "Ex. –," refer to exhibits submitted with Respondent's answer, ECF No. 13.

Case No. 4:18cv509-WS/CAS

Worthey appealed his judgment and sentence to the First District Court of Appeal (First DCA), assigned case number 1D13-0361.  Ex. D. On December 5, 2013, the First DCA per curiam affirmed the case without a written opinion.  Ex. D; Worthey v. State, 127 So. 3d 508 (Fla. 1st DCA 2013) (table).

On March 25, 2015, Worthey filed a pro se motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850.  Ex. E at 4-42. He subsequently filed an amended Rule 3.850 motion, raising twelve (12) claims of ineffective assistance of counsel (IAC).  *Id*. at 59-84.  The State filed a response.  *Id*. at 86-87.  By order on June 8, 2016, the state post-conviction trial court set all claims for an evidentiary hearing.  *Id*. at 88-94. By order on July 12, 2016, the court granted Worthey's motion for appointment of counsel.  *Id*. at 94.

The evidentiary hearing on the Rule 3.850 motion took place February 3, 2017.  Ex. E at 110-205 (transcript).  At the conclusion of the hearing, the court made findings on the record and denied relief.  *Id*. at 197-203.  In an order entered February 10, 2017, the court denied the Rule 3.850 motion "for the reasons stated on the record."  *Id*. at 103.

Worthey, through counsel, appealed the denial of post-conviction relief to the First DCA and filed a brief in assigned case number 1D17-653. Ex. F.  The State filed an answer brief, Ex. G, and Worthey filed a reply, Ex. H.  On March 6, 2018, the First DCA affirmed the case without a written opinion.  Ex. I; Worthey v. State, 242 So. 3d 342 (Fla. 1st DCA 2018).  The mandate issued March 27, 2018.  Ex. I.  Worthey sought discretionary review in the Florida Supreme Court, assigned case number SC18-672. Ex. J.  On May 4, 2018, that court dismissed the case for lack of jurisdiction.  *Id*.

As indicated above, Worthey filed his § 2254 petition on or about November 2, 2018, ECF No. 1, and he subsequently filed an amended § 2254 petition, ECF No. 9.  In the amended § 2254 petition, Worthey raises ten grounds, all claiming ineffective assistance of counsel (IAC):

> **(1)  IAC – Failed to Conduct Adequate Pretrial Investigation and Conceded Worthey's Guilt at Trial**:  Worthey asserts he provided counsel "with viable information concerning his innocence and if that information was used or adequately investigated it would have concurred with Petitioner's theory of innocence, that he was <u>never</u> on the scene of the alleged offenses and was only testifying that he <u>was</u> on the scene because counsel 'coerced' him into not only testifying which Petitioner never originally had <u>any</u> intentions of doing but also writing exactly what he was told to say in a letter so he'd

remember exactly what to say."  ECF No. 9 at 10.  Worthey indicates he was actually at the Pick-n-Pull "with two law-abiding citizens:  K'yatta S. Livingston and Jacqueline Ash at the very exact time the crime was said to be committed."  *Id*.

**(2)  IAC – Failed to Impeach Detective's Testimony**: Worthey asserts trial counsel did not properly impeach Detective James Besse's trial testimony on issue of misidentification.  *Id*. at 12.

**(3)  IAC – Failed to Excuse Sleeping Juror**:  Worthey asserts trial counsel performed ineffectively by not excusing a sleeping juror after he told both his attorneys that "the African American juror with the dreads, sitting in the first row was 'nodding' on and off, in and out of sleep."  *Id*. at 14.

**(4)  IAC – Failed to Present Available Evidence Supporting Worthey's Theory of Innocence**:  Worthey asserts he sent trial counsel a letter informing them of two alibi witnesses, Livingston and Ash, who would testify that he was at the Pick-and-Pull at the time the crime occurred at the community center.  *Id*. at 16.

**(5)  IAC – Coerced Worthey to Change Story for Trial**: Worthey asserts his counsel performed ineffectively by coercing him to change his story and testify at the trial that he was present at the crime scene.  *Id*. at 19.

**(6)  IAC – Failed to Move for Judgment of Acquittal**: Worthey asserts his trial counsel performed ineffectively by not moving for a judgment of acquittal (JOA) at the close of the evidence.  *Id*. at 20.  Worthey indicates that when the trial judge inquired about whether counsel would move for a JOA, counsel whispered to Worthey that "if the judge was asking him this at the current stage to which the trial phase was in at that time then it was a good chance that trial could be won and that he'd

rather win the trial than take the 'easy' way out by entering a
JOA." *Id*.

**(7)  IAC – Failed to Move to Suppress Out-of-Court
Identification**:  Worthey asserts trial counsel performed
ineffectively by not filing a motion to suppress the out-of-court
identification by the victim, Christopher Deshaizer, who first
identified Vishuntavious Sutton, a co-defendant, as the shooter
and later "changed his story and claimed that Petitioner[] was
actually the shooter." *Id*. at 21-22.  Worthey asserts the photo
line-up from which Deshaizer identified him "was highly
suggestive and did not portray how Petitioner looked at the time
of the offense." *Id*. at 22.  Worthey asserts Detective Besse
"took extreme measures to make sure [the] victim identified
Petitioner in the photo line by using a dated picture of Petitioner
from a year before's arrest to make Petitioner fit the physical
description that victim had voiced." *Id*.

**(8)  IAC – Failed to Impeach Victim**:  Worthey asserts his trial
counsel performed ineffectively by not impeaching the victim
with his previous inconsistent statements regarding the
shooter's identity.  *Id*. at 23-24.

**(9)  IAC – Failed to Call or Use Expert to Challenge
Testimony of State's Firearm Expert**:  Worthey asserts his
trial counsel should have retained a firearms expert to
challenge testimony regarding the type and accuracy of the
firearms described at trial. *Id*. at 25.

**(10)  IAC – Failed to Object to Verdict on Basis of
Insufficient Evidence**:  Worthey asserts counsel performed
ineffectively by not challenging the verdict as contrary to the
weight of the evidence and moving for a new trial. *Id*. at 26.

Respondent has filed an answer and exhibits.  ECF No. 13.  Worthey has

filed a reply.  ECF No. 20.

## **Analysis**

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and

Effective Death Penalty Act of 1996 (AEDPA), federal courts may grant

habeas corpus relief for persons in state custody.  Section 2254(d)

provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not
> be granted with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the adjudication of
> the claim –
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceeding.

28 U.S.C. § 2254(d).  *See, e.g.,* Cullen v. Pinholster, 563 U.S. 170, 180-83

(2011); Gill v. Mecusker, 633 F.3d 1272, 1287-88 (11th Cir. 2011).  "This is

a 'difficult to meet' and 'highly deferential standard for evaluating state-

court rulings, which demands that state-court decisions be given the benefit

of the doubt.'" Cullen, 563 U.S. at 181 (quoting Harrington v. Richter, 562

U.S. 86, 102 (2011), and Woodford v. Visciotti, 537 U.S. 19, 24 (2002)).

This Court's review "is limited to the record that was before the state court

that adjudicated the claim on the merits." *Id*.

For claims of ineffective assistance of counsel (IAC), the United

States Supreme Court has adopted a two-part test:

> First, the defendant must show that counsel's performance was
> deficient. This requires showing that counsel made errors so
> serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment. Second,
> the defendant must show that the deficient performance
> prejudiced the defense. This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial,
> a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984). To demonstrate

ineffectiveness, a "defendant must show that counsel's performance fell

below an objective standard of reasonableness." *Id.* at 688. To

demonstrate prejudice, a defendant "must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Id.* at 694. "A reasonable

probability is a probability sufficient to undermine confidence in the

outcome." *Id.* For this Court's purposes, importantly, "[t]he question 'is not

whether a federal court believes the state court's determination' under the

Strickland standard 'was incorrect but whether that determination was

unreasonable – a substantially higher threshold.'" Knowles v. Mirzayance,

556 U.S. 111, 123 (2009) (quoting Schriro v. Landrigan, 550 U.S. 465, 473

(2007)). "And, because the Strickland standard is a general standard, a

state court has even more latitude to reasonably determine that a

defendant has not satisfied that standard." *Id.* It is a "doubly deferential

judicial review that applies to a Strickland claim evaluated under the

§ 2254(d)(1) standard." *Id.*

### Ground 1:  IAC – Pretrial Investigation and Concession of Guilt
### &
### Ground 4:  IAC – Evidence Supporting Theory of Innocence

These two grounds are analyzed together as they involve similar

claims.  In his first ground, Petitioner Worthey argues his trial counsel did

not do an adequate pretrial investigation although he had provided counsel

with the names of two individuals, K'yatta Livingston and Jacqueline Ash,

who would have testified that he was elsewhere, specifically at the Pick-n-

Pull, at the time the crime occurred at the Walker-Ford Community Center.

ECF No. 9 at 10.  He further argues that counsel performed ineffectively by

conceding guilt at trial, although he does not elaborate on this in his

petition.  *See id*. Respondent indicates Worthey exhausted this ground in

state court by raising it as the first claim in his Rule 3.850 motion.  ECF No.

13 at 28; *see* Ex. E at 47-50.

At the conclusion of the evidentiary hearing, the post-conviction trial

court judge made the following findings on the record in denying this claim:

> Count 1 is an allegation of inadequate pretrial investigation and conceding guilt at trial.
>
> I don't think the defense conceded guilt at all at trial, having read the entire transcript.  The defense was that the co-defendant, Mr. Vishuntavious Sutton was the one that shot the victims and that the Defendant was not involved.
>
> Mr. Collins [defense counsel] argued ably and was able to get some hearsay statement in that the State was strenuously objecting to at Pages 311 through 317.  And those had to do with whether Chris Deshazier, the victim that lived, whether he made some statements right after the incident about whether it was Mr. Sutton that was the shooter.  And he got those statements in through an officer that Mr. David Collins [defense counsel] called in his case in chief, one of four officers that he called in his case in chief.
>
> Chuck Collins [defense counsel] testified that he did investigate the video at the Pick-n-Pull; that there was no video, and he also – Mr. Collins investigated the two alibi witnesses and determined that they couldn't offer any testimony that would support or corroborate the Defendant's alibi claims and his testimony was credible on that.

Ex. E at 197.

Similarly, in his fourth ground, Petitioner Worthey argues his trial

counsel provided ineffective assistance by not presenting available

evidence supporting his theory of innocence.  ECF No. 9 at 16.  Worthey

indicates he sent counsel a letter with information about two alibi witnesses, Livingston and Ash, who would testify he as at the Pick-and-Pull at the time the crime occurred at the community center.  *Id*.

Respondent indicates Worthey's claim here is similar to that raised in Ground 1.  ECF No. 13 at 28.  Respondent also indicates Worthey raised the ground as the fourth claim in his Rule 3.850 motion, *id*., *see* Ex. E at 47-50, and appealed the denial of the claim to the First DCA, *see* Ex. F at 32-38.

At the conclusion of the evidentiary hearing, the post-conviction trial court judge made the following findings on the record in denying this claim:

> Related to Count 4, failure to present evidence of the Defendant's theory of innocence, and this also mentions the alibi witnesses.  Again, in the – and someone – the person who actually committed the crime, Vishuntavious Sutton, did testify at the trial; and Mr. David Collins questioned him about the shooting on Pages 157 through 160.  And it was admitted in evidence that Sutton was about 5'8", which was the height that Mr. Deshazier, I guess, identified the shooter as, or that was certainly the defense theory, that he was identified as the shooter and was approximately 5'8", and evidence of that was admitted on Pages 376 and 348 of the transcript.
>
> And then the Defendant himself testified that he was 6'2", and Mr. Collins asked a couple of other witnesses about that, so that the Defendant's height definitely came into evidence.

Ex. E at 199-200.

The state court record supports the determination by the post-conviction judge that defense counsel did not concede guilt at trial. *See* Ex. B. Further, the record supports the post-conviction judge's findings that defense counsel did not perform deficiently. In particular, as the court found, defense counsel presented argument, and testimony to support the argument, that Worthey's co-defendant, Vishuntavious Sutton, was the person who shot the victims and Worthey was not involved, discussed in the analysis of Grounds 2 and 8, *infra*. *See* Ex. B at 90-94, 225-27, 311-17, 348, 376, 391-98.

As the court also found, defense counsel Chuck Collins testified that he tried to found out if the Pick-n-Pull had a surveillance video, but to his knowledge, "there was never any video from there." Ex E at 155. Chuck Collins further testified that, after investigating the alibi witnesses referenced by Worthey, concluded those witnesses could not offer testimony that would support Worthey's alibi claim. Ex. E at 142-43, 155.

The post-conviction judge properly found defense counsel credible. The state post-conviction trial court sits as the fact-finder and determines witness credibility in Rule 3.850 proceedings. *See, e.g.*, <u>Consalvo v. Sec'y for Dep't of Corr.</u>, 664 F.3d 842, 845 (11th Cir. 2011) ("Determining the credibility of witnesses is the province and function of the state courts, not a

federal court engaging in habeas review."); Smith v. State, 697 So. 2d 991, 992 (Fla. 4th DCA 1997); Fla. R. Crim. P. 3.850(d).  "Federal habeas courts have 'no license to redetermine credibility of witnesses whose demeanor was observed by the state court, but not by them.'" Consalvo, 664 F.3d at 845 (quoting Marshall v. Lonberger, 459 U.S. 422, 434 (1983)).

Based on the foregoing, Petitioner Worthey has not shown that the state court's rejection of these grounds involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(1)-(2). Accordingly, these grounds should be denied.

**Ground 2**:  **IAC – Failed to Impeach Detective's Testimony**
**&**
**Ground 8**:  **IAC – Failed to Impeach Victim**

These grounds, both alleging defense counsel performed ineffectively in impeaching witnesses, are analyzed together.  In his second ground, Petitioner Worthey argues his trial counsel provided ineffective assistance by not properly impeaching the trial testimony of Detective James Besse on the issue of misidentification.  ECF No. 9 at 12.   In particular, Worthey asserts:

> Investigator Detective James Besse of the Tallahassee Police
> Department testified at Petitioner's trial and admitted under
> oath that he pointed to photograph #5 in a photo line up
> consisting of six different individuals and said to the victim,

Christopher Deshaizer, that, "that him right isn't it. . . that the guy right there right?"  Detective Besse also admitted that the original identification of the shooter strayed from 5"7 and 5"10 and that Vishuntavious Sutton (said co-defendant in case) was identified by Christopher Deshaizer, victim, in a sworn affidavit on the scene of crime not even a good hour later, by height, weight, skin complexion, hair style, clothing description and by name.  He stated that through "investigation" Petitioner was developed as the shooter, when in fact a anonymous tip came in through crime stopper's tipline implementing that, they overheard petitioner telling someone he'd just killed someone.  Trial counsel's failure to impeach Detective's testimony regarding speculative and lack-luster testimony denied Petitioner's right to have a fair and impartial trial.

*Id*.

Respondent indicates Worthey exhausted this ground by raising it as the second claim in his Rule 3.850 motion and presenting it in the appeal from the denial of post-conviction relief.  ECF No. 13 at 33; *see* Ex. E at 48-49, Ex. F at 33-40.  The First DCA affirmed the case per curiam without a written opinion.  Ex. I.

The state post-conviction trial court denied the claim, on the record at the conclusion of the evidentiary hearing, making the following findings:

Related to Ground 2, failure to impeach the detective's testimony on misidentification, Mr. David Collins crossed Investigator Besse on Pages 222 to 228 of the transcript.  He thoroughly crossed Investigator Besse on the inconsistencies in Mr. Chris Deshazier's statement and crossed Mr. Deshazier on Pages 90 through 92.

He called the four defense witnesses in addition to the Defendant and argued in closing that the – the victim, in fact,

was identifying the other co-defendant, Mr. Sutton, and not the
Defendant.  The pages of that closing are 391 through 398
where Mr. David Collins talks about that.  And the – the
different physical descriptions were a big part of that also.
Meaning the different heights that we've talked about today,
and I'll get – I'll talk about that a little bit more in a moment.

Ex. E at 197-98.

The state court record supports the post-conviction judge's findings.

In particular, the trial transcript reflects, as the court found, Worthey's

attorney cross-examined Sergeant James Besse, who worked as an

Investigator in the Homicide/Violent Crimes Unit of the Tallahassee Police

Department in May 2011.  *See* Ex. B at 208-09.  On direct, Besse testified

that he understood Christopher Deshazier was in the vehicle when the

shooting occurred and "he was grazed on his back with a bullet."  *Id*. at

210.  Besse was "only on scene for 10 or 15 minutes" when he "was told by

[his] supervisor" to transport Deshazier back to the police department to

conduct an interview.  *Id*. at 209-10.  Deshazier provided Besse with the

name of a suspect and Besse developed another suspect's name as well.

*Id*. at 210-11.  Deshazier provided Besse a description of the shooter

before Besse developed Worthey's name.  *Id*. at 217.  Besse testified that

Deshazier "described [the shooter's] hairstyle as unkempt, like it could have

been put into twists, but it wasn't. . . . [and] described that the suspect was

dark-complected and that he had tattoos that were kind of hard to see, but

he believed they were flames, tattoos, on his arms." *Id*. at 217.  Besse

prepared a photo lineup, which included a photo of Worthey as well as five

other individuals and "[a]ll the individuals have similar characteristics, same

sex, same race, and similar age groups." *Id*. at 212.  Besse presented the

lineup to Deshazier and told him "the suspect may or may not be in the

photo lineup" and that "[p]eople's hairstyle changes, facial hair changes,

people gain and lose weight, and to concentrate on their facial structure."

*Id*.  Besse testified he puts the line up down in front of the witness and has

the witness look at it; Besse removes his hands from the lineup when he

shows it to a witness.  *Id*. at 212-13.  Besse testified that Deshazier picked

out Number 5, which depicted Worthey, and Deshazier "stated that he was

the one that was in the vehicle and had shot the victim in his face and shot

Mr. Deshazier." *Id*. at 213.  Besse instructed Deshazier to sign and date

the picture.  *Id*.

On cross, David Collins questioned Besse about a sworn statement

taken by Officer Derrick Kidd from Deshazier at the crime scene, before

Besse interviewed Deshazier and conducted the photo lineup.  *Id*. at 222-

24.  Besse reviewed the statement while on the stand.  *Id*. at 224-25.

Collins then questioned Besse further:

Q  Now, you know what that statement says, don't you?

A  Yes, sir.

Q  It's an identification, isn't it, by Chris Deshazier of who the shooter was, isn't it?

A  I don't know if I read that.  He mentions a name in there.

Q  Go ahead.  This is the statement of identification of who the shooter was.  There's a name and there's a physical description.  And if I'm wrong, tell me.

A  All it says is "he," sir.  It doesn't verify who that is.

Q  It says more than that, doesn't it?

A  Well, in the identification of when he says who pulls a gun on him, he says "he."  It doesn't give a name.

Q  Right.  But if you read it in total context, it tells you who it was, doesn't it?

A  It could be interpreted that way, yes.

Q  It could be interpreted that way?

A  I mean, if he specifically would have said who shot, then the name should be there.  All it says is "he."

Q  Well, whose name did he put in there?  Who did he say just got out of prison two weeks before?

A  He called him V.

Q  V?

A  Uh-huh.

Q  Right.  And that's who he described as the shooter, isn't it?

A  No, sir.  He says "he" pulled.  It doesn't say V.

Q  Who does he say got out of prison two weeks beforehand? Who's he talking about?

A  At the beginning, he's talking about the person that he called.  And he describes him as V.

Q  V?

A  Right.

Q  Then he keeps referring to that person as "he," doesn't he?

A  He said that he called.

Q  Right.

A  And he had a little green to smoke.

Q  Right.  And then what?

A  And then he said he wanted to meet us.  Then he says, "We got there and he pulled a gun."  That's all he said, is "he."

Q  Right.  And at the end he says he just got out of prison, didn't he, two weeks ago?

A  He'd been out about two weeks, correct.

Q  So are you telling this jury he's not referring to V?

A  I'm saying he says "he."  That's what I'm saying.

*Id*. at 225-27.  Besse testified he "based [the] probable cause affidavit off of the interview, the direct interview," he had with Deshazier and he did not talk to Officer Kidd about the case.  *Id*. at 227-28.

On redirect, Besse testified "the shooting came in about 3:30 in the afternoon and [he] was probably interviewing [Deshazier] by 5:00." *Id*. at 230. Besse testified he prepared two photo line-ups, one that included Worthey and one that included Vishuntavious Sutton. *Id*. Deshazier identified Vishuntavious Sutton in the other line-up. *Id*. at 231.

Defense counsel's cross-examination of Besse, and questioning about Vishuntavious Sutton, ties in with his cross-examination of one of the victims, Christopher Deshazier, who had testified earlier that day in the trial. In his eighth ground, Worthey argues his trial counsel provided ineffective assistance by not impeaching Deshazier with his previous inconsistent statements regarding the shooter's identity. ECF No. 9 at 23-24. Respondent indicates Worthey did not exhaust this ground because, although he raised it as the tenth claim in his Rule 3.850 motion, he did not challenge its denial on appeal. ECF No. 13 at 65; *see* Ex. E at 54-56, Ex. F. Respondent further indicates, on the merits, the ground should be denied. ECF No. 13 at 66-71.

The state post-conviction trial court denied the claim, on the record at the conclusion of the evidentiary hearing, making the following findings:

> Count 10 . . . has to do with impeaching the living victim and that he changed his story and testified inconsistently with the written statement.

Mr. David Collins did a thorough cross examination of Mr. Chris Deshazier in Pages 92 through 113 of the trial transcript and also crossed him about that he called Mr. Vishuntavious Sutton "Old Boy," and got him to admit to some inconsistencies about who the shooter was and the difference in heights that I've already discussed.  I'm going to find that there was no deficient performance or prejudice on Count 10.

Ex. E at 202.  The record supports the court's findings.

During his direct testimony, Christopher Deshazier described the incident that ended in the shooting.  Ex. B at 65-81.  Deshazier explained that his brother, Maricus, had driven to the Walker-Ford center; Deshazier was in the front passenger seat, Phillip Sutton was in the backseat behind Maricus, and Vishuntavius Sutton was in the backseat behind Deshazier. *Id*. at 69.  They were going to buy marijuana and Vishuntavius had said a friend was meeting them at Walker-Ford.  *Id*. at 68-70.  After they parked at Walker-Ford, Worthey came up to them and Vishuntavius and Phillip walked off; Worthey got in the backseat of the vehicle, behind Maricus.  *Id*. at 70-72.  Deshazier had never met Worthey before and did not know his name.  *Id*. at 74.  Deshazier testified that Worthey asked them how much they wanted and Worthey "went digging in his . . . little bag he had his, his gun in. . . . [a]nd then he pulled out, then he pulled out his gun and put it to the back of my brother head."  *Id*. at 74-75.  Deshazier testified it was a revolver, a .38, and Worthey said "give it up, give up everything."  Id. at 75.

At first, Deshazier thought Worthey was joking, and he turned to glance in the back and saw the gun behind his brother's head, which scared him.  Id. at 75-76.  Worthey slapped Maricus in the head with the gun a couple of times.  *Id*. at 76.  Deshazier testified, "And that's when my brother turned and started, like, tussling for the gun or whatever.  And Worthey started shooting."  *Id*. at 76-77.  His testimony continued:

> Q  Okay.  Did you go for the gun, as well?
>
> A  Yes.
>
> Q  Christopher, at this point, what is going on in your mind?  What are you thinking?
>
> A  I'm, like – it ain't too much you could think when someone is shooting in a car while you're in there.  It's just – you got to go off of instincts.  And my instinct, like, you got to get out of here.  You know, so when, when he had started shooting, I was just like – my brother kind of had his weight on me, because we in a small car.
>
> And I could tell that, you know what I'm saying, like – like, this dude may be trying to, you know what I'm saying, hurt us.  You know?  It wasn't just attention, just like to get money.  Like, to me, I couldn't really think real fast, so I don't know what, you know . . .
>
> Q  Okay.  Let me back you up.  You said your brother's weight was on you.
>
> A  Yeah.
>
> Q  Do you know what happened that caused his weight to be on you?

>    A  Because, like, when he turned around – my brother is
> a big person.  So when he turned around to do the tussle with
> old boy, like, he was already on top of me kind of like we all
> tussling.  You know what I'm saying?  Like, 'cause, like, old boy
> got the gun and point –
>
>    Q  You're saying – what are you calling him?
>
>    A  Old boy.
>
>    Q  Okay.
>
>    A  I meant to say Worthey.

*Id*. at 77-78.  Deshazier testified his brother had been shot and he was also

shot at as he left the car and he "played like I was dead."  *Id*. at 78.  He

"laid on the ground beside the car for, like, maybe five or six seconds," and

then he got up to see if his brother was okay; as he got up, he saw Worthey

standing on the other side of the car.  *Id*. at 78-79.  Deshazier testified that

he "looked him in the eyes, he just looked shocked, like he didn't believe

that he just had done that.  *Id*. at 79.  Deshazier testified that Worthey then

started running toward the tennis field.  *Id*. at 80.  Deshazier testified that

his backside was grazed by a bullet and he has a scar.  *Id*. at 81-82.

Deshazier testified that he spoke with emergency personnel and law

enforcement.  *Id*. at 84.  He gave the officers Vishuntavius Sutton's name.

*Id*.  He testified, "That's the only name I knew."  *Id*. at 85.  He testified about

the interview with Investigator Besse and how he picked Worthey's photo in

the line-up, identifying Worthey as the shooter.  *Id*. at 85-86.  Deshazier

also identified Worthey in court as the person who shot at him and shot his

brother.  *Id*. at 87-88.

On cross, defense counsel brought out inconsistencies in Deshazier's

account.  For instance, counsel noted that Deshazier had referred to the

shooter as "Old Boy" and that is the name Deshazier used for Vishuntavius:

> Q  And this, this gentleman that you call Vishuntavius, you've
> been knowing him since you were in kindergarten, correct?
>
> A  Yes.
>
> Q  And you refer to him as an old friend, don't you?
>
> A  Yes.
>
> Q  Sometimes you call him old boy, don't you?
>
> A  Yes.
>
> Q  Okay.  And that's what you told this jury a few minutes ago.
> You slipped and said it was old boy in the backseat and then
> you changed your story and said it was Darrius [Worthey],
> didn't you?  Isn't that what you told the jury?
>
> A  Yes.

*Id*. at 90.  Defense counsel also elicited testimony on cross that Deshazier

sometimes called Vishuntavius other names and that Vishuntavius had

recently been released from prison:

> Q  Okay.  But you also called him V?

A  Yes.

Q  Sometimes you called him Veeshon; isn't that true?

A  No.

Q  Vishuntavius, you never called him Veeshon?

A  No.

Q  Now, he had called you, correct?

A  Yes.

Q  And you knew that he had just gotten out of prison, correct?

A  Yes.

*Id*. at 90-91.  Even though Deshazier testified he never called him

Veeshon, a few questions later, he answered a question that included that

name for Vishuntavius:

> Q  All right.  But as things went on that day, all the maneuvering
> that you were talking about, meeting him at Holton Street and
> moving on, you got suspicious about Veeshon, didn't you?
>
> A  (Nods head.)
>
> Q  Isn't that true?
>
> A  Yes.

*Id*. at 91.  Defense counsel also impeached Deshazier with his deposition

testimony that "Vishuntavius looked like he had a gun just a second" after

Deshazier testified at trial that he could not recall saying that it looked like Vishuntavius had a gun.  *Id*. at 92-94.

As the post-conviction judge explained, defense counsel also called four witnesses, in addition to Worthey himself, and argued in closing that Deshazier actually identified Vishuntavius Sutton, not Worthey, as the shooter.  *See id*. at 391-98 (closing).  Based on this record, it was not unreasonable for the state court to conclude that defense counsel's performance was not deficient in cross-examining Besse and Deshazier.

The state court's adjudication of Petitioner's claims did not involve an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.  Under the double deferential review this Court applies to a <u>Strickland</u> claim evaluated pursuant to the § 2254(d)(1) standard, Petitioner's claims fail.

### <u>Ground 3</u>:  IAC – Failed to Excuse Sleeping Juror

In his third ground, Petitioner Worthey argues his trial counsel provided ineffective assistance by not seeking to excuse a sleeping juror. ECF No. 9 at 14.  Worthey indicates he told both his attorneys that "the African American juror with the dreads, sitting in the first row was 'nodding' on and off, in and out of sleep."  *Id*.

Respondent indicates Worthey did not exhaust his state court remedies on this claim because he did not raise the issue on appeal after it was denied by the state post-conviction trial court.  ECF No. 13 at 40.  On the merits, Respondent asserts the claim should be denied.  *Id*. at 42-46.

Worthey raised this ground as the third claim in his Rule 3.850 motion.  The state post-conviction trial court denied the claim, on the record at the conclusion of the evidentiary hearing, making the following findings:

> Related to the sleeping juror, neither Mr. Chuck or Mr. David Collins remembered anyone sleeping.  David Collins testified that he remembered someone mentioning it.  I think he might – Mr. David Collins might be thinking about Judge Sheffield mentioning it, because Judge Sheffield specifically asked about this in his colloquy at the end of the case on Page 454.  And I think that's somewhat unusual for a judge to ask that, but he – Judge Sheffield did a really thorough colloquy at the end of the case, asking the Defendant about anything that should have been done on the case, whether any sleeping jurors were observed, just a really detailed colloquy.
>
> And the Defendant testified at that time that he didn't see any sleeping juror and that the Collins had done everything on his case that he asked them to do, and that he was totally, quote, totally satisfied with their representation.  That's on Page 452 of the transcript.
>
> And then also David Collins testified that if the Defendant had brought any sleeping or dozing juror to his attention, he would have kept a real close eye on it and brought it to the Court's attention.

Ex. E at 198-99.

The state court record supports the post-conviction judge's findings. At the evidentiary hearing, David Collins testified that, regarding the issue of a sleeping juror, "for some reason that does seem to ring a bell," but he did not remember if it was in Worthey's trial. Ex. E at 173. David Collins further testified:

> I do believe Darrius mentioned something like that to me. I can't say that he didn't, but I can tell you that I didn't examine it; and, therefore, probably would have said, "Well, keep an eye on them, and I'll be more vigilant." And if, in fact, it happened again then – but I do remember something like that. I'm – I'm not going to – I do have an independent memory of either Darrius or somebody saying something to that effect, but I didn't – I don't think the record shows anything was done about it.

*Id*. He also testified he would have raised it with the court if he thought it was an issue:

> Q  Okay. Now, let's explore that a little bit. If somebody – if a client says, "That juror over there is sleeping," then I think you indicated that – keep an eye on him; you would pay attention to it?
>
> A  Absolutely.
>
> Q  If you thought it was an issue or something that was in some way harming your client, would you have brought it to the Court's attention?
>
> A  Yes. And I have done that many times in a lot of trials. I mean, let me be clear. I never saw one sleeping. I don't believe Charles Collins, who was present, ever mentioned anything of that. But I'm not going to say that Darrius Worthey

didn't mention that to me.  And if he had, I would have been
aware of it.

Would I have necessarily brought it to the Judge's
attention based on that?  No.  What I would have done is
looked over at the jury and see if it happens again.

And I – my experience, sometimes people appear to be in
that mode and they're really not.  They are just sitting there, you
know, for hours and hours.  That's my best answer.  I don't
know what else to say.

Q  But – and, again, would it – would it have been an issue that
you thought needed – if you thought it was a problem for your
client or thought it was a problem that needed to be brought to
the Court's attention, would you have brought it to the Court's
attention?

A  Absolutely.  I'm not going to try a case with people sleeping
even if I put them to sleep.

*Id*. at 173-74.

Based on this record, it was not unreasonable for the state court to

conclude that defense counsel's performance was not deficient.  The state

court's adjudication of this claim did not involve an unreasonable

application of clearly established federal law, nor was it based on an

unreasonable determination of the facts.  Under the double deferential

review this Court applies to a <u>Strickland</u> claim evaluated pursuant to the

§ 2254(d)(1) standard, Petitioner's claim fails.  This ground should be

denied.

## **Ground 5**:  IAC – Coerced Petitioner to Change Story for Trial

In his fifth ground, Petitioner Worthey argues his trial counsel

provided ineffective assistance by coercing him to change his story and

testify at trial that he was present at the crime scene.  ECF No. 9 at 19.

Respondent indicates Worthey exhausted this ground by raising it as the

fifth claim in his Rule 3.850 motion and appealing the denial of the claim to

the First DCA.  ECF No. 13 at 47-48; *see* Ex. E at 50-51, Ex. F at 40-45.

On appeal, the First DCA affirmed the case per curiam without a written

opinion.  Ex. I.

The state post-conviction trial court denied the claim on the record at

the conclusion of the evidentiary hearing, making the following findings:

> On Count 5, that counsel coerced Defendant into
> changing his story, David Collins testified today credibly that he
> absolutely did not coerce the Defendant into changing his story.
>
> The State, of course, had the DNA evidence that included
> the Defendant as a donor on the outside door that the
> Defendant testified he did touch.  And then the State also had
> identifications of the Defendant by Chris Deshazier and the Co-
> Defendant, Vishuntavious Sutton.
>
> Judge Sheffield conducted a detailed colloquy with the
> Defendant prior to him testifying, on Pages 330 through 332,
> and made it clear that it was the Defendant's decision, and he
> understood that and decided that he wanted to testify.
>
> Judge Sheffield asked him again at the end of the trial
> about that, and he confirmed that on Page 453.

Ex. E at 200.

The record supports the post-conviction trial court's finding that

defense counsel did not perform deficiently.  The transcript of the

evidentiary hearing contains David Collins' testimony:

> Q  All right.  Now, if the Defendant made the allegation in his
> motion that you coerced him into changing his story –
>
> A  That would never happen.  I don't coerce anybody what to
> say.  Why would I – with all due respect to Mr. Worthey, I like to
> win, but I like to win for me.  I don't care if I win for him or not,
> quite honestly.  And I would never risk my license or even a
> claim of integrity against me to tell somebody, "You have got to
> say this."
>
> Now, would I also knowingly put him on knowing it was a
> lie?  No, I wouldn't, either.  But I don't know it's a lie; but, you
> know, I don't know it's the truth.  I don't know what it is.  But
> he's got a right to say it if he wants to.

*Id*. at 168.  The record also contains the trial transcript, which includes the

questioning of Worthey by Judge Sheffield regarding his decision to testify:

> THE COURT:  All right.  Mr. Collins, what is your client's
> decision?
>
> MR. DAVID COLLINS:  Your Honor, I think you need to talk to
> him.  I believe he wants to testify.
>
> THE COURT:  All right.  Mr. Worthey?
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:  You understand that the decision whether or not
> to become a witness in this case is entirely up to you.

THE DEFENDANT:  Yes, sir.

THE COURT:  Your lawyers can advise you, but they can't make the decision for you.

THE DEFENDANT:  Yes, sir.

THE COURT:  And if you take the witness stand, you will be subject to being cross-examined the same as any other witness has been.  You understand?

THE DEFENDANT:  Yes, sir.

THE COURT:  And you're subject to the same credibility issues as any other witnesses in this case.

THE DEFENDANT:  (Nodding head affirmatively)

THE COURT:  And there's a jury instruction if you don't testify that I give that says that –

THE DEFENDANT:  I read it.

THE COURT:  Okay.  They can't use that against you.  If you do testify, there's a jury instruction that says to take your testimony the same as anybody else's.

THE DEFENDANT:  (Nodding head affirmatively)

THE COURT:  If you take the witness stand and if you have any prior convictions for any felony charges or any crimes of dishonesty or moral turpitude, you can be asked if you do and if so, how many times.

And if you are correct when you say how many times, that's the extent of where it can go.  If you're not and it turns out that there are more times than what you've made reference to, then they can go a little further with that as far as the questioning is concerned.

> Only facts that are in evidence can be argued.  So if
> there's no testimony from you, whatever facts you may put in
> can't be argued because there's no facts from you.
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:  And you understand that there are lesser
> included offenses that go in there.  So your testimony may help
> you.  It may hurt you.  I don't know what it's going to be.
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:  But it's certainly your choice as to whether you
> want to do that or not.  So knowing all of that, is it your decision
> to become a witness in this case?
>
> THE DEFENDANT:  Yes, sir.

Ex. B at 330-32.  Likewise, at the conclusion of the trial, while the jury was

out deliberating, the judge again confirmed with Worthey that it was his

decision to testify:

> THE COURT:  And you made the decision in this case on your
> own to testify.  You were not forced to do that by your lawyers.
>
> THE DEFENDANT:  No, sir.
>
> THE COURT:  And I don't know what their advice was one way
> or the other, but they gave you their advice and input before
> you made that decision.
>
> THE DEFENDANT:  Yes, sir.

*Id*. at 453.  At the beginning of that questioning, the judge also asked

Worthey if he was satisfied with his attorneys' work representing him:

THE COURT:  . . . As you sit there, you've been here through the entire trial and everything that has happened and you've been here with your lawyers.  You've been communicating with your lawyers in this case.  Are you totally satisfied with the representation that you were provided by your lawyers?

THE DEFENDANT:  Yes, sir.

*Id*. at 452.

Based on this record, it was not unreasonable for the state court to conclude that defense counsel's performance was not deficient.  The state court's adjudication of Petitioner's claim did not involve an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.  Under the double deferential review this Court applies to a <u>Strickland</u> claim evaluated pursuant to the § 2254(d)(1) standard, Petitioner's claim in this ground fails.

**<u>Ground 6</u>:  IAC – Failed to Move for JOA**
**&**
**<u>Ground 10</u>:  IAC – Failed to Object to Verdict**

These grounds, both alleging defense counsel performed ineffectively in not challenging the State's evidence, are analyzed together.  In his sixth ground, Petitioner Worthey argues his trial counsel provided ineffective assistance by not moving for a JOA at the close of the evidence.  ECF No. 9 at 20.  Worthey asserts that that, when the trial judge asked whether counsel would move for a JOA, counsel whispered to Worthey that "if the

judge was asking him this at the current stage to which the trial phase was in at that time then it was a good chance that trial could be won and that he'd rather win the trial than take the 'easy' way out by entering a JOA." *Id*.

Respondent indicates Worthey did not exhaust this ground because, although he raised it as the sixth claim in his Rule 3.850 motion, he did not challenge its denial on appeal.  ECF No. 13 at 51-52; *see* Ex. E at 51-52, Ex. F.  Respondent further indicates, on the merits, the ground should be denied.  ECF No. 13 at 53-58.

The state post-conviction trial court denied the claim, on the record at the conclusion of the evidentiary hearing, finding that "David Collins testified today that he didn't feel that he had a legal basis to do so, so I'm going to find that that's not a deficient performance."  Ex. E at 200.  On appeal, the First DCA affirmed the case per curiam without a written opinion.  Ex. I.

Similarly, in his tenth ground, Worthey argues his trial counsel provided ineffective assistance by not challenging the verdict as contrary to the weight of the evidence and moving for a new trial.  ECF No. 9 at 26. Respondent indicates Worthey exhausted this ground by raising it as the twelfth claim in his Rule 3.850 motion and presenting it in his appeal from

the denial of post-conviction relief.  ECF No. 13 at 77-78; *see* Ex. E at 56-57, Ex. F at 49-52.

The state post-conviction trial court denied the claim, on the record at the conclusion of the evidentiary hearing, making the following findings:

> And then 12 kind of relates to the JOA or insufficiency of the evidence.  And David Collins testified credibly that there was no legal basis to move either for a JOA or for a Motion for a New Trial, so I'm going to find that there's no deficient performance or prejudice on that count.

Ex. E at 203.  On appeal, the First DCA affirmed the case per curiam without a written opinion.  Ex. I.

The record supports the post-conviction trial court's findings in denying both of these claims.  In particular, Chuck Collins testified he believed there was sufficient evidence to send the case to the jury and explained, "It came down to a common credibility, who do you believe? And that was an issue for the trier of the fact."  Ex. E at 144.  He testified he did not believe a JOA would have been granted.  *Id*.  On cross, he testified that he generally makes a JOA motion "[i]f there's a good-faith basis to do such" and he "wouldn't make one just for the sake of making one if [he did not] have a good-faith basis to believe one needs to be made."  *Id*. at 151.

In addition, David Collins testified he believed there was sufficient evidence in this case to go to the jury and "the transcript bears that out." *Id*. at 170.  He further testified:

> Q  And so is it unusual for you either not to make a Judgment of Acquittal argument or just to make a boilerplate Judgment of Acquittal argument?
>
> A  I don't make boilerplate motions.
>
> Q  Okay.  But it would not be unusual if you thought there was sufficient evidence to go to the jury to –
>
> A  I probably would not.  You can go look at a lot of my trials.  If there's not evidence there, I'm not going to make a motion.
>
> Q  Okay.
>
> A  I don't need to waste my time, the Court's time, or anybody's time making motions, because that's in the how-to book.

*Id*. at 171.  Likewise, with regard to a motion for a new trial, counsel testified he would not have filed such a motion unless he "found a good-faith basis to do it."  *Id*. at 181.

The trial transcript reflects that defense counsel actually did make a barebones JOA motion after the State rested, then withdrew the motion, and the judge agreed it was a matter for the jury to decide:

> MR. DAVID COLLINS:  Your Honor, I will make a motion for judgment of acquittal, but in quite all honesty, I think it's a jury question at this point at this time.  If you have to make it in the light most favorable to the State at this time, if they believe certain witnesses, then I can't really in good faith make some

big, long, drawn-out motion.  I think it's just a waste of time.  So
I'll withdraw the motion.  I think we need to get on with the case.

THE COURT:  Okay.  All right.  So it will be denied.  I agree
with you that it is a jury question at this point. . . .

*Id*. at 302-03.

Moreover, as set forth in the analysis of Grounds 2 and 8, *supra*, the

State presented the testimony of Deshazier that Worthey shot Deshaizer's

brother, Maricus, from the backseat of the car.  Ex. B at 67-68, 75, 77-78.

The State also presented the testimony of Vishuntavius Sutton, Worthey's

co-defendant, who testified that Worthey pointed a gun at Maricus and, in

the struggle that followed, Sutton heard gunshots and ran away.  *Id*. at 141-

45.

Based on this record, it was not unreasonable for the state court to

conclude that defense counsel's performance was not deficient.  The State

presented sufficient evidence to support every element of the crimes and,

thus, a judgment of acquittal was not proper.  *See, e.g*., Anderson v. State,

504 So. 2d 1270, 1271 (Fla. 1st DCA 1986).  "Because conflicts in the

evidence and the credibility of the witnesses have to be resolved by the

jury, the granting of a motion for judgment of acquittal cannot be based on

evidentiary conflict or witness credibility."  Sapp v. State, 913 So. 2d 1220,

1223 (Fla. 4th DCA 2005); *accord* <u>Johnson v. State</u>, 247 So. 3d 689, 696

(Fla. 1st DCA 2018).

Similarly, with regard to the motion for a new trial, given the evidence,

there is no likelihood such motion would have been granted.  *See, e.g.*,

<u>Johnson</u>, 247 So. 3d at 697.  Defense counsel cannot be ineffective for not

filing a meritless motion.

The state court's adjudication of this claim did not involve an

unreasonable application of clearly established federal law, nor was it

based on an unreasonable determination of the facts.  Under the double

deferential review this Court applies to a <u>Strickland</u> claim evaluated

pursuant to the § 2254(d)(1) standard, Petitioner's claims fail and these

grounds should be denied.

### <u>Ground 7</u>:  IAC – No Motion to Suppress Out-of-Court Identification

In his seventh ground, Petitioner Worthey argues his trial counsel

provided ineffective assistance by not moving to suppress the out-of-court

identification by the victim, Christopher Deshaizer.  ECF No. 9 at 21-22.

Worthey explains Deshaizer first identified Vishuntavious Sutton, a co-

defendant, as the shooter and later "changed his story and claimed that

Petitioner[] was actually the shooter."  *Id*.  Worthey asserts the photo line-

up from which Deshaizer identified him "was highly suggestive and did not

portray how Petitioner looked at the time of the offense." *Id*. at 22.

Worthey asserts Detective Besse "took extreme measures to make sure

[the] victim identified Petitioner in the photo line by using a dated picture of

Petitioner from a year before's arrest to make Petitioner fit the physical

description that victim had voiced." *Id*.

Respondent indicates Worthey exhausted this ground by raising it as

the seventh claim in his Rule 3.850 motion and appealing the denial of the

claim to the First DCA.  ECF No. 13 at 59; *see* Ex. E at 52-53, Ex. F at 46-

48.  On appeal, the First DCA affirmed the case per curiam without a

written opinion.  Ex. I.

The Florida Supreme Court has explained:

> [T]he test for whether a suggestive identification procedure
> should be excluded has two prongs:  '(1) did the police employ
> an unnecessarily suggestive procedure in obtaining an out-of-
> court identification; [and] (2) if so, considering all the
> circumstances, did the suggestive procedure give rise to a
> substantial likelihood of irreparable misidentification.'

Simmons v. State, 934 So. 2d 1100, 1118 (Fla. 2006) (quoting Grant v.

State, 390 So. 2d 341, 343 (Fla. 1980)); *see* Cikora v. Dugger, 840 F.2d

893, 895-97 (11th Cir. 1988).  The U.S. Supreme Court has explained the

factors that a court should consider in determining the likelihood of

misidentification included "the opportunity of the witness to view [the

person] at the time of the crime, the witness' degree of attention, the

accuracy of the witness' prior description of the [person], the level of

certainty demonstrated by the witness at the confrontation, and the length

of time between the crime and the confrontation." Neil v. Biggers, 409 U.S.

188, 199-200 (1972).

Here, the state post-conviction trial court denied the claim, on the

record at the conclusion of the evidentiary hearing, making the following

findings:

> [O]n Count 7, which is failure to move to suppress the
> out-of-court identification, there's absolutely no evidence
> presented today that the lineup was suggestive.  And, in fact, if
> the photo was old or looked different, I think it would be less
> suggestive than more suggestive.

Ex. E at 201.  The record supports the post-conviction trial court's findings

that nothing indicates the photo line-up was suggestive.  If the court

concludes the photo line-up was not impermissibly suggestive, it need not

proceed to the Biggers factors.  Cikora, 840 F.2d at 895-96.

In particular, as discussed in the analysis of Ground 2, *supra*, Officer

Besse testified regarding the photo line-up he had prepared, from which

Deshazier selected Worthey's photo.  Even if Besse used a dated photo of

Worthey, nothing indicates that rendered the lineup suggestive; indeed, as

the state post-conviction judge found, an old photo would seemingly be

less suggestive.  Nothing indicates Besse told Deshazier, in showing him

the line-up, that the suspect was in the line-up; rather, Besse testified at trial that he told Deshazier "the suspect may or may not be in the photo lineup" and, further, that "hairstyle changes, facial hair changes, people gain and lose weight," advising him "to concentrate on their facial structure."  Ex. B at 212-13.  *See, e.g.*, Green v. State, 641 So. 2d 391 (holding photographic lineup not unduly suggestive where, although officer indicted suspect was in lineup and suspect's photo was darker than others, nothing indicated officer directed victim's attention to any particular photograph).  Further, as also explained above, Deshazier's interview with Besse occurred within hours of the crime and Deshazier had looked Worthey in the eyes as, or immediately after, the shooting occurred.

Based on this record, it was not unreasonable for the state court to conclude that defense counsel was not deficient in not filing a motion to suppress Deshazier's out-of-court identification of Worthey.  The state court's adjudication of Petitioner's claim did not involve an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.  Under the double deferential review this Court applies to a Strickland claim evaluated pursuant to the § 2254(d)(1) standard, Petitioner's claim in this ground fails.

## Ground 9:  IAC – No Firearms Expert

In his ninth ground, Petitioner Worthey argues his trial counsel

provided ineffective assistance by not retaining a firearms expert to

challenge testimony regarding the type and accuracy of the firearms

described at trial.  ECF No. 9 at 25.  Respondent indicates Worthey

exhausted this ground by raising it as the eleventh claim in his Rule 3.850

motion and challenging its denial on appeal to the First DCA.  ECF No. 13

at 72; *see* Ex. E at 56, Ex. F at 48-49.

The state post-conviction trial court denied the claim, on the record at

the conclusion of the evidentiary hearing, making the following findings:

> And then Count 11 is – has to do with the firearms expert.
> David Collins testified today that absolutely wouldn't have any
> effect because the type of gun didn't matter.  In the end, David
> Collins did conduct a detailed cross examination of the firearms
> expert on Pages 295 through 299 of the trial transcript, but that
> was – as he testified today, he didn't think it would make any
> difference, and that was a strategy decision on his part.  So I'm
> going to find that there's no deficient performance or prejudice.

Ex. E at 202-03.  On appeal, the First DCA affirmed the case per curiam

without a written opinion.  Ex. I.

The record supports the post-conviction trial court's findings.  At the

evidentiary hearing, defense counsel David Collins testified that he did not

ever consider calling a firearms expert to rebut the State's expert.  Ex. E at

172.  Collins testified, "[W]ith all due respect, I really don't listen to my

clients for legal advice." *Id*. He further testified that challenging the State's firearms expert was not critical as there was no dispute the victim was killed by a gun and Worthey had maintained he was not at the scene and was not the shooter:

> Q  Did you have any basis to believe the firearm – the State's firearm expert wasn't one – wasn't credible?
>
> A  It's – it's irrelevant.
>
> Q  So why –
>
> A  The guy is killed by a gun, we know that.  What kind of gun it is, who cares, really?  I mean, really, how does that affect our client one way or another?  He is either not there, he is either there; but if he didn't shoot him, who cares what kind of gun it is?

*Id*.    Further, as the state post-conviction court found, defense counsel thoroughly cross-examined the State's expert during the trial.  Ex. B at 295-99, 301-02.

Based on this record, it was not unreasonable for the state court to conclude that defense counsel's performance was not deficient.  The state court's adjudication of Petitioner's claim did not involve an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.  Under the double deferential review this Court applies to a Strickland claim evaluated pursuant to the § 2254(d)(1) standard, Petitioner's claim in this ground fails.

## Conclusion

Based on the foregoing, it is respectfully **RECOMMENDED** that the amended § 2254 petition, ECF No. 9, be **DENIED**.

## Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11(b) provides that a timely notice of appeal must still be filed, even if the court issues a certificate of appealability.

Petitioner fails to make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) (explaining substantial showing) (citation omitted). Therefore, the Court should deny a certificate of appealability.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." The parties shall make any arguments as to whether a certificate should issue by filing objections to this Report and Recommendation.

Leave to appeal in forma pauperis should also be denied.  *See* Fed. R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is filed, the court may certify appeal is not in good faith or party is not otherwise entitled to appeal in forma pauperis).

### **Recommendation**

It is therefore respectfully **RECOMMENDED** that the amended § 2254 petition, ECF No. 9, be **DENIED**.  It is further **RECOMMENDED** that a certificate of appealability be **DENIED** and that leave to appeal in forma pauperis be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on September 18, 2019.

S/  Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


### **NOTICE TO THE PARTIES**

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**